Good morning. May it please the court, my name is Lori McKinley and I'm here for the first panel of witnesses before a judge. I'd like to reserve three minutes for rebuttal. Prior to us coming here today you asked us to respond to two questions. The first question is whether a request for medical need for a serious health condition under the FMLA can also constitute a request for accommodation under the ADA. I think both parties have said from a legal perspective that the answer to that question is yes. The second question is whether adverse actions and the constellation of facts that surround them, which could lead to a finding of retaliation under the FMLA, can also constitute harassment under the ADA. And again, both parties answered the question yes. And that is why the district court's decision in this case must be reversed. The district court looked at the same set of facts with two sets of lenses. I'm sorry, they actually put the lenses in their pockets and looked at the ADA case. But you can look at these facts under the lens of the FMLA or the lens of the ADA or both and come to a conclusion that the facts which created the retaliation also created a hostile work environment that Mr. McCall was subjected to every day that he went to work. The district court's decision is internally inconsistent. It doesn't take into account the way hostile work environments actually operate in real life. The hostility, I'm sorry, go ahead. The hostility, the hostile work environment that you're talking about has to be a pervasive and serious or severe harassment. Is that fairly accurate? Pervasive or severe, yes. Say again? Pervasive or severe. Pervasive or severe. How is this pervasive or severe? It seemed to me that oftentimes the employer was simply trying to enforce certain rules including union benefits and union rules. How is the hostility serious or pervasive? Okay. Well, I think you've raised a couple of issues here. First of all, the district court did not address the pervasive or severe problem because he went on to say, you know, I'm going to look at whether it's because of disability or request for accommodation. The city raised that in their response to the briefs. So that's the first issue. And the second thing is with regard to pervasive or severe, first of all, we have at least one incident which qualifies as severe all by itself. On June 24th when Mr. McCullough was called into a disciplinary hearing, he was publicly humiliated. The inspector general said, well, doesn't that have to be based on the disability? I agree with you that the district court never reached the pervasive or severe question. The district court did not do so because it didn't have to. It pursuant to Walton, Judge Nygaard's opinion, I believe, said that the harassment wasn't based on the disability, right? Well, in this case, it was. Well, how? How do we know that from the record? Where was anything said about Mr. McCullough's knee problems? Well, first of all, there were a number of things said about Mr. McCullough's knee problems and the way he walked. I'm asking you about the single incident you are focusing on, which certainly was an example of bad behavior on the part of the city official, but I have struggled in working with the record to find where it can be said that that reflected some, not only awareness on her part of the specific condition Mr. McCullough suffered from, but that her behavior had anything to do with his disability. It has to be based on. How is it based on? The context matters, as the Supreme Court has said numerous times in addressing questions like this under the totality of the evidence standard. This was towards the end of a very long series of events. It started all the way back in 2005 when the city first accused Mr. McCullough, falsely, of being a sick leave abuser. They labeled him. They kept putting him on this. We can all agree that this case has a very long and tortured history from 2005 up to Mr. McCullough's dismissal in 2011. Everything in life depends on context. I'm trying to find where in the record we can see that the incident you refer to as being severe harassment was based on his disability, his knee disability. First of all, this is the third time Mr. McCullough has been with Kayla Jones in a disciplinary hearing. Everybody knew about Mr. McCullough's disability. A lot of people had problems with Kayla Jones, presumably people who had no knee problems at all. There's nothing in the record to reflect that her difficulties with other employees for which she was disciplined, as well as for what she did to Mr. McCullough, were the function of her animus towards some kind of disability. We didn't put anything like that in the record. In this case, there is a lot of record evidence that everybody in management knew about Mr. McCullough's knee problems. The reason Mr. McCullough was being disciplined to begin with is because of his... Excuse me. Stop right there. Everybody knew this. How do we know that? In fact, didn't Mr. McCullough himself concede in his deposition that he never explicitly asked for an accommodation because of his knee disability? Did he make that concession? That's not quite accurate. First of all, he made a request for accommodation for mechanical devices because of his knee condition. Mr. McCullough didn't know. Here's what took place at the deposition. Question. Yeah. My question, though, is did you have an ADA accommodation? Did you request an ADA accommodation? Answer. There was no need to do that because it was something that was given to each and every employee as part of the civil service regulations. You say that's not an admission that he never explicitly made a request? Absolutely. Absolutely, Your Honor. This is a situation in which Mr. McCullough didn't know that that was a possible accommodation. His union didn't know. Managers didn't know. Ms. Jones didn't know. Ms. Howard didn't know, who was the head of HR. The only person who ever said it was even feasible was Christine Lopez, who I can't remember exactly what her title was. She was at the top of the management of the airport. She said, oh, well, if he labeled it as a request for accommodation, maybe we would have done it. But nobody had ever seen it done. Kayla Jones had never seen it done. Nobody had ever seen it done. Mr. McCullough didn't know that that would be a request for accommodation. Nobody told him that. Nobody said, gee, it sounds like you're requesting an accommodation here. Here's a form for you to fill out. This is our process. That never happened. There's never an active process in this case. How does an employer know that they must accommodate if they haven't been asked to accommodate? Well, in a situation like this where the employer is on a regular basis receiving medical certification saying this man has a knee problem, it's progressive, it's chronic, from time to time it's going to require him to be off work because of flare-ups from the condition itself and from the medication that we're giving him. What were the notifications from medical professionals that the employer received concerning Mr. McCullough's knee problem up to the time of the Kayla Jones incident? The employer had received numerous certifications from the doctor under the FMLA indicating what I just said. Where are they? Well, yes, there was an FMLA request that Mr. McCullough took some leave time when his wife was pregnant and delivered a child prematurely. But that had nothing to do with his knee problem. That had nothing to do with his knee. That's correct. He had a difficulty with a car on another occasion. That had nothing to do with his knee problem. Well, I would disagree with that, Your Honor, because as the district court found below, there is enough evidence to create an abundantly clear jury question. I think those are the words that the court uses. Whether the hostility to which Mr. McCullough was subjected on an emergency day off when your car is being towed and you can't get to work. You're straying from my question, counsel, which was where in the record are the notices from medical professionals to the airport or the city that what Mr. McCullough was suffering from specifically was a knee problem? We have a number of requests for leave of absence in the record. I can get you the numbers when I sit down and we have to provide those to you. But there are a number of those. And the doctors specifically talk about how it's chronic, progressive. It's not going to get better because Mr. McCullough is not eligible for a knee replacement. And there is no dispute. Nobody says that they didn't know about Mr. McCullough's knee condition. Nobody. Kayla Jones claimed that on the third time she saw Mr. McCullough, she didn't know. She had been in two other hearings of Mr. McCullough. He was always saying, look, the reason I'm taking time off is because of my knees. Is it the case that the city was fully aware that he had a very serious problem with his knees? Absolutely. They were absolutely aware. Was it documented via medical reports? It was documented numerous times. And in addition, to respond to your question just a little further, the law is clear that the individual does not have to know magic words. I mean, it's an accommodation. I guess Ms. Brewer can speak about this, but the city doesn't really challenge his claim that he had a serious knee problem. I'm sorry? The city doesn't challenge McCullough's position that he had a very serious knee problem, even if they knew it. That's absolutely undisputed in this record. Right. So the question then is, you would agree, would you not, that it is whether or not the harassment was based on the disability. Or his request for accommodation, which could include his request for ethnoline leave, which the city was tired of accommodating. And his request was to take unpaid leave? Yes. But of course, he ran into this problem that he took three days and misrepresented the reason for taking the three days. And that created further problems down the road for his request for unpaid leave. It's undisputed that the city told him that that's how he had to do it. And if he didn't do it that way, he would be punished. He said, I don't want to do that. That doesn't make any sense to me. Well, let's take a step back for a moment, because the city told him to do that. But what he wanted to do was take three days off to take care of his wife when he was pregnant. But then he made something up, like, I was sick. Because they told him to. They told him to make something up. They told him to call and say, that's not disputed, Your Honor. That is the reason. I think that's the reason further down the road why they wouldn't give him credit for those three days, because they say he misrepresented the facts. Well, the Department of Labor said that was an FMLA violation. There is no doubt that Mr. McCulloch should not have had to submit sick notes, which he said, I'm not sick. I'm only doing this because you're making me do it. And there were a number of depositions. There's no dispute that that's what happened. And that's how he ended up in that situation. But really, when you tear it all down, like, what created this entire thing, the thousands of pages that you have in front of you, there's lots more where that came from. It all has to do with three days. If there had been three days of sick leave, we all wouldn't be here. Thank you. OK. Very good. Ms. McKinley, thank you very much. Ms. Spruill? Three days. Three days, yes. Am I correct, just to, again, put this in context? Yes. An employee, such as Mr. McCulloch, gets 15 sick days per year. Yes. 11 paid holidays. Yes. 10 days of vacation. 10 or 15. Four days of administrative leave. Yes. And that the civil service regs provide for a kind of discretionary 15 working days, or up to? Up to 15 working days on top of FMLA leave. Yes. Well, yeah, in addition to the FMLA leave, which is unpaid. This can get very arcane. I just want to make sure I'm being concise. Absolutely. Right. All right. So as Judge Fuentes has just commented, and as your adversary has ended her argument, this all comes down to three days. Yes. Out of all of this, does it? Well, yes. As the city has told the court in the additional briefing that we submitted. So had he been given those three days, in other words, had the family medical leave right been covered those three days, he would have had further down the road unpaid leave available. Potentially. I think, but you have to look at what were those three days about. He was asking for three days to look after his wife. Yeah. And that's where this case. That's not for a disability or health condition of kids. Correct. How about the fact, of course, that Mr. McKinley finished up on, which is that he was told to do it that way. Well, we can't dispute that for purposes of summary judgment. But where the rubber met the road, and even Mr. McCall testified, I wasn't called upstairs until 2009, came when he said, I want to change this. I want to change this into three days for my wife. And Yvonne Howard, the head of HR, said no. And saying, I want FMLA leave for my wife for whatever reason why. He didn't, maybe he didn't put it down right. Maybe, or, you know, he misrepresented on purpose. He misrepresented because someone told him to. What matters for purposes of these two claims is, what are you asking it for? And he was asking for FMLA leave to take care of his wife. Maybe he wanted to use his unpaid leave for any number of reasons. But that determines, ultimately, what box this fits into. That's why I began my question with the iteration of the various types of leave vacations. Right. And so if you've maxed out on one, you may want it to be another type. You may want it to be. Or you may want to save some time on another. You may want to save some time, but the question is, what is the employer supposed to do? And what are you using that time for? The duty under the ADA is for reasonable accommodation. It's not, you know, you get whatever you want whenever you want it. And here, what the city did is the city accommodated him. How so? Pardon? How so? With a light. He asked for light duty. He got it. He asked for... Light duty being the riding burnisher? Riding burnisher, but also light duty in terms of a modified work schedule, yes. I mean, there was a point, I mean, further beyond that when he was apparently asking for a lot of time. He was asking for... I mean, you don't dispute that he had a serious knee problem. No, no, that hasn't been disputed at all. That's not even... So you knew that he had a problem, and you knew that he was asking for serious time off because of his ailment. And when he did, the city granted it. It granted it in 2005. Or in a few instances, he was denied a request, but then that determination was overturned at 11. There were meetings. He was written up as an AWOL no docs, which is different than an AWOL no call, no show. And then there were meetings, and then it got fixed, or it was rescinded. Time and again, 2005, he asked... I mean, time and again, when he asked for FMLA leave for his knee condition, it was granted. Where the hostility and where the problem occurred and, you know, the FMLA claim is not before this court, we settled it. I'm sorry, what happened at the end, though? Because, I mean, he was fired. He was fired because he took time off, but... Well, he was fired because he was let go. He was fired because Mr. McCall went out, used up his FMLA leave, and then took two further, what are called medical leaves of absences, which you can take an extended unpaid medical leave of absence under the city's civil service regulations. He took four months until January. He said, I want to take more time. January of 2011? 2011. He said, I want to take four more months. The city said... He gave a note, and the city said, that's not enough. We'd like to know what it is that you're taking time off for. And there was this repeated extension for him to give the documentation. He never did. Some of it was, I think, because he said he was unable to see his doctor. Some of it was because he said he was unable to see his doctor. And when that happened, the city said, okay, we'll give you another month. Right. If you look in the record... From February to March, I believe, of 2011. Yes. Did he at any time make it clear that that was a result of his knee problem? That was not... He did not say that was due to his knee problems. He said that was due... What his doctor said is he was suffering from depression. So he was taking extended medical leave to deal with mental health issues. Now... And then what happened was that at the end of... At the end, it was the two time frames coincided that he hadn't provided the documentation. And also, he, at the very end of the four months he had requested, the April time frame, the city said, we've given you several extensions. You haven't come back. You haven't told us when you're coming back. And under the civil service regulations, we are letting you go. Did the city work with him? I mean, having knowledge of the problem that he had, did the city pull him over to the side and have a conference with him and ask, for example, what is it that we can do? How can we address your disability? Well, the city did. I mean, this is a pretty rough and tumble environment. I mean, this is a union, civil service, you know, back and forth kind of thing. But there were repeated... There were... I mean, there were meetings along the way. There was a one step, two step, three step meeting with Mr. McCall, where he was feeling aggrieved about the way he was being treated. And there was that, you know, that back and forth there. There was the back and forth with regard to, you know, when this all started back in 2005, where he and the union and the city went back and forth about, you know, his doctor submitted a note saying he's going to be incapacitated. The city said, well, you have to be out. The union said, oh no, he can do this. He just needs the ride. He just needs the ride on Burnisher as opposed to the walk behind Burnisher. This back and forth occurred over the course of Mr. McCall's time with the city. And that's... So on the accommodation side of things, and we've talked about this in our brief and elsewhere, the city accommodated him repeatedly in various forms. And with regard to the hostile work environment claim, and we've talked about this probably in our conversation just now,  nor is there a claim here, based on the language in the statute, that the employer city failed to engage in an interactive process. That's not part of this case. That's not part of this case. But I think to address Judge Fuentes' concern, I hope, there was a lot of back and forth over the years with Mr. McCall. And having to submit notes because, yeah, you need to have aid, or you're on the sick leave list, and then you submit two. And there's sort of this back and forth was part and parcel of being a DC33 employee, but it was also part and parcel of how the city was sort of dealing with and accommodating Mr. McCall's disability. And in terms of the hostile work environment claim, I think in our conversation we've discussed why it wasn't based on disability. And I think the Walton case that Judge Nygaard authored sets that out quite well, that your employer can be, your supervisor may be kind of obnoxious, or maybe a jerk, or maybe violating our familiar rights, but that isn't necessarily harassment based on disability. And as far as the question of whether the environment was severe or pervasive, that's something we put forward before the district court, but we wanted to put it forward before this court to offer an alternative. Well, we can affirm for any reason supported by the record. Yes. But also part of why we wanted to bring this out was to kind of help, was to help this court understand the context in which this case occurred, which is out at the airport, the city needs its custodians to clean and to clean out the bathrooms and empty the trash. And that also there's this sort of back and forth with your crew chief and the union steward and the requirements of all the different kinds of leave and just kind of making the airport run. And that most of what Mr. McCall is discussing as sort of the severity or the pervasiveness is just kind of the ebb and flow of dealing with this pretty, shall we say, involved system of civil service regulations, a collective bargaining agreement, being a DC33 member. The record in the case is really very complex. It's at times very hard to get through because we're talking about several years, but I do remember reading somewhere where he had asked for, I think, time off and his supervisor was a Mr. Broadnax, who rejected, no, no, no, you're not going to get anything. Well, that was a request for a vacation. Because he had problems with other supervisors, too, I'm just giving you that. Yes. I shouldn't say he had problems with them, but maybe they had problems with him. Well. Or maybe it was mutual. Well, thank you for bringing that up. The couple of things, with regard to that particular incident with Mr. Broadnax, that was a request for a vacation day for his anniversary. And Mr. Broadnax wrote, no, no, denied. Now, that's a, that might be for any number of reasons, but it doesn't necessarily demonstrate animus or on the basis of disability, but also in terms of just severity or pervasiveness. Okay, you don't get a day off. That's upsetting to the employee, but that isn't necessarily severe or pervasive. And also, when we look at the bulk of the allegations of severity or pervasiveness have to do with the two kind of low-level supervisors, Mr. Doc Mason and Mr. Broadnax. And here we've got a four-year period in what might be called, and in fact, we do call sporadic incidents, where the, these incidents were felt, and we're not disputing they were felt as pervasive, but when he was pressed at his deposition, for instance, he talked about Mr. Broadnax constantly writing me up. And then, well, how many times? Well, five times. And two of those got rescinded? Yes, it was three. Or at one point, it was, well, I was questioning his authority because I didn't want to come in for a vacation because it was snowing, and he was hollering at me. Or Mr. Mason saying, after he'd taken time off for his uncle and his father and his children, he said, you know what, you're always taking time off. Now, these are not necessarily, these may be understandable. These may be not understandable. They may be kind. They may be unkind. But this is sort of the give and take of a workplace. And the fact that something may be tense or uncomfortable or you have a bad relationship with your supervisor, this court's ruled and other courts have ruled that's not severe or pervasive for us. No, but it was clear to the city that he had a very serious physical problem. Yes. And of course, the question we have to consider is, was he accommodated for, given his physical disability? Yes, he was, repeatedly. Was he properly accommodated? Well, was he properly accommodated? He was accommodated with, when he requested late duty, he got it. When he requested time off, he got it. When he requested extended leaves of absence, he got it. The only thing that the plaintiff is trying to hang his hat on is this concept that he could, by his presence at meetings, what was at issue was this, you know, definitely for his wife, he could have asked for more unpaid leave. Now, what he could have done or would have done, that's not a request for an accommodation. But also, in those situations, he had, in the past, it's in the record, he had requested paid days off. And also, even though you can't necessarily advance sick time, you can't advance vacation days. So the city cannot accommodate something that was never requested or from a plaintiff's sense that he really deserved it. When he did ask for it, he knew how to ask for it. The city gave it to him and agreed, this is a long and complicated record, but that really is the bottom line on the accommodation claim. Okay. Anything further? Ms. Rowe, thank you very much. Thank you. Ms. McKinley. I'd like to start with the termination issue. That's not really what we're here to talk about. The termination was a culmination of a long hassle work environment that went on for many years. Mr. McCall was not able to come back to work at that point in time. So the real issue is the hassle work environment and what are we going to do about that. The three days that I mentioned before I sat down, we're not arguing about whether he was allowed to have those days to take care of his wife or not. That's irrelevant. The implication of the three days is that the city took those sick days away and then never gave him access to either those sick days or an extension of medical leave for three days when he was sick down the road. That's why we have this problem. In 2009, Mr. McCall was sick twice for his knees. He was out of sick leave. They wouldn't let him take his vacation time because he was on this no unpaid leave list. And that set up the whole thing for the discipline that would go on for months and months and months, hearing after hearing after hearing, in which Mr. McCall was in there saying, look, I need access to this unpaid leave time or my sick time or the vacation time I already have to manage my disability. I am dependent upon that. And the city knew that. The interactive process is implicated in this case. It's implicated in any case like this. Have you argued it? Not as a specific legal claim, but the issue with the interactive process is that at any of those meetings, the city could have said, look, you have a problem. We have a problem. How can we work together to come up with something that works for everyone? That's the model that Congress had in mind when they enacted the ADA. What exactly they wanted to avoid in enacting the ADA is what we're here today to talk about. This is exactly what we don't want to have happen. The city placed him in a position where he was not able to access medical leave, which he needed as a reasonable accommodation, which the ADA provides as an option for reasonable accommodation unless there was an undue hardship. There was no argument of undue hardship. It was not even raised in response to the complaint in this case. So the city could have granted him three extra days over the course of 2009 and 2010, and we wouldn't be here in those days to take care of the medical condition, which they don't dispute he has. And this is not a guy that was never at work. And I think there's been sort of an exaggeration about this man. Remember, at the end of his career, he still had 40 FMLA days that he could take. He still had vacation time. This man was at work. There's no dispute about his work performance. He had a very serious disability. And the city knew. The city refused to take any action. They refused to budge an inch on their policies. And the ADA specifically talks about methods of administration that are used to impede accommodation. And that's what happened in this case. The city wants to say, well, we treat everybody the same. It's rough and tumble. It's this, it's that. That's not what the ADA says. You can't just say, this is our policy. You have to live with it. The ADA says, you look at the policies. You look at the situation. You look at the disability. You look at the job. You look at everything. And then you determine whether we can modify this without an undue burden, keep the guy at work. Everybody wins. That's what's supposed to happen. Mr. McKinley, thank you very much for your arguments. Thank you both for your arguments. Very well presented. And we'll take the case under